## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-18-199-5 |
| | § | |
| | § | |
| LEATRICE MALIKA DE BRUHL-DANIELS | § | |

### MEMORANDUM AND ORDER

Pending before the court are defendant Leatrice Malika De Bruhl-Daniels's motion to dismiss counts 25–28 for a Speedy Trial Act violation (Dkt. 311), motion to dismiss counts 15, 25–28, and 36–37 for failure to state an offense (Dkt. 312), and motion to strike (Dkt. 313). The United States of America (the "Government") has responded in opposition to all three motions. Dkts. 315–17. Having considered the motions, responses, and applicable law, the court is of the opinion that defendant's motion to dismiss counts 25–28 should be GRANTED, but that defendant's motion to dismiss counts 15, 25–28, and 36–37, and motion to strike should be DENIED.

### I. BACKGROUND

On September 28, 2018, the Government filed a criminal complaint against De Bruhl-Daniels. Dkt. 1. The complaint alleges that De Bruhl-Daniels engaged in a course of conduct spanning from June 1, 2016 to September 12, 2018 that constituted one or more violations of 18 U.S.C. § 1512(c)(2) (attempting to obstruct, influence, or impede any official proceeding). *Id.* Attached to the complaint was a ten-page affidavit detailing the conduct.

De Bruhl-Daniels was a Special Agent with the Naval Criminal Investigative Service (NCIS). *Id.* ¶ 4. While stationed at the United States Consulate in Dubai, U.A.E., she allegedly

became acquainted with a Syrian national named Nadal Diya. *Id.* ¶¶ 5–6. Through her interactions with representatives from various other federal agencies, the complaint alleges, De Bruhl-Daniels learned that Diya was the target of active federal criminal and counterterrorism investigations. *Id.* ¶¶ 6–11, 15, 17.

The complaint alleges that, among other things, De Bruhl-Daniels told Diya some of what she had learned about the federal investigations, including that he was a target. *Id.* ¶¶ 18–19. It also alleges that when the FBI interviewed her on December 18, 2017 regarding her interactions with Diya, De Bruhl-Daniels concealed relevant information about her romantic relationship with him and what she had disclosed to him. *Id.* ¶¶ 20–21. Finally, the complaint alleges that De Bruhl-Daniels prepared Diya for his own interview with federal agents by providing him with details about her interview, instructions on what to bring and how to respond to questions, and an admonition not to disclose details of their relationship. *Id.* ¶ 22.

The complaint followed the filing of an indictment (Dkt. 1) on April 11, 2018, that charged one of De Bruhl-Daniels's codefendants, Fadi Issa Issa, with willfully filing false tax returns, and a superseding indictment (Dkt. 6-1) on September 26, 2018, that charged a total of four codefendants—Issa, Diya, Labib Deeb Arafat, and Maximiliano Sandoval Romero—with various other crimes.

## A. Obstruction Counts (15 and 25–28)

On October 24, 2018, a federal grand jury returned a second superseding indictment, which for the first time added De Bruhl-Daniels as a codefendant and charged her in count 15 with a violation of 18 U.S.C. § 1512(c)(2). Dkt. 16 at 10. Count 15 offered as a factual basis for the charge that De Bruhl-Daniels had "provid[ed] details of certain federal criminal investigations to NADAL DIYA, including that he is the target of those federal criminal investigations, the names

of other targets of those federal criminal investigations, and that he would face arrest if he traveled to the United States." *Id.*

On January 9, 2020, the grand jury returned a fifth superseding indictment, which again included count 15, but also charged De Bruhl-Daniels in counts 25–28 with four additional violations of 18 U.S.C. § 1512(c)(2).  Dkt. 210 at 9, 15–16.  Counts 25–27 concerned statements that De Bruhl-Daniels made to the FBI in the December 18, 2017 interview, and count 28 related to her role preparing Diya for his interview with federal agents.  *Id.*

On March 5, 2020, the grand jury returned a sixth superseding indictment that restated verbatim counts 25–28.  Dkt. 274 at 14–16.  It also split the conduct previously charged in count 15 across counts 15, 36, and 37.  *Id.* at 9, 22–23.

### B. False Statement Counts (21–24 and 32–34)

De Bruhl-Daniels is also charged with a number of violations of 18 U.S.C. § 1001(a) (false statements).  Unlike the § 1512(c) counts, the precise chronology of when the § 1001(a) counts first appeared is not relevant.  What is relevant is that De Bruhl-Daniels was charged with violating § 1001(a) in two contexts.  First, she is alleged in counts 21–24 to have concealed, in the December 18, 2017 FBI interview, details about her personal and sexual relationship with Diya, that he gave her around $1,400, that he promised to give her son a job, and that she told him he was the target of several law enforcement investigations, including an FBI counterterrorism investigation.  *Id.* at 12–14.  Second, she is alleged in counts 32–34 to have falsely represented in an April 24, 2018 Departure Briefing form that she had not had contact with any country nationals, had no intimate relationships with any foreign nationals to report, and was not aware of any classified or sensitive information being compromised.  *Id.* at 19–21.

3

## II.  MOTION TO DISMISS COUNTS 25–28

De Bruhl-Daniels first asks the court to dismiss counts 25–28, asserting that the Government failed to timely indict her on these counts, resulting in a Speedy Trial Act ("STA") violation.  Dkt. 311.

### A.  Legal Standard

The STA requires that "any information or indictment charging an individual with the commission of an offense [be] filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b). Further, if a complaint is filed against a defendant but no information or indictment is filed within thirty days charging the same offenses contained in the complaint, then those charges "shall be dismissed or otherwise dropped."  *Id.* § 3162(a)(1).  Where there "is both a timely and an untimely indictment, the first instrument will toll the STA clock only if the indictments charge an identical offense."  *See United States v. Martinez-Espinoza*, 299 F.3d 414, 416 (5th Cir. 2002) (quoting *United States v. Perez*, 217 F.3d 323, 328 (5th Cir. 2000)).  Whether two offenses are identical depends on "whether each provision requires proof of an additional fact which the other does not." *Id.* at 417 (quoting *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932)).  In other words, "where the conduct charged in an initial accusatory instrument, and a subsequent indictment produce[] congruent Venn circles, the conduct is the same 'offense' for purposes of § 3161(b)."  *Id.*

### B.  Analysis

#### 1.  Timeliness Under the STA's Thirty-Day Rule

The complaint filed on September 28, 2018, charged De Bruhl-Daniels with a violation of 18 U.S.C. § 1512(c)(2).  Dkt. 1.  Attached to the complaint was an affidavit detailing all the conduct supporting counts 15 and 25–28, all of which are alleged violations of § 1512(c)(2).  *Id.*

The second superseding indictment, which contained count 15, was returned twenty-six days later on October 24, 2018, comfortably within the thirty-day limit mandated by the STA. Dkt. 16. The fifth superseding indictment, which was the first to contain counts 25–28, was returned on January 9, 2020, more than a year after the complaint. Dkt. 210. One indictment is timely and the other is untimely. The timely indictment tolled the STA clock for only the offense it charged. *See Martinez-Espinoza*, 299 F.3d at 416. The clock was not tolled for any conduct charged in the complaint, but not included in the second superseding indictment. *See id.* If the fifth superseding indictment, therefore, charges any such conduct, then those counts must be dismissed.

To resolve this issue, both De Bruhl-Daniels and the Government point to the same test, explained in *Martinez-Espinoza*, for determining whether the charging documents charge the same offense. Dkt. 311 at 4; Dkt. 316 at 3. As the court explained in that case, "where the conduct charged in an initial accusatory instrument, and a subsequent indictment produce[] congruent Venn circles, the conduct is the same 'offense' for purposes of § 3161(b)." *Martinez-Espinoza*, 299 F.3d at 417. The term "Venn circles" is no doubt a reference to the Venn diagram, a graphical tool used to compare two items. In the typical Venn diagram, there are two circles that overlap slightly. Each circle represents one of the items being compared. For example, suppose one wishes to compare *A* and *B*. One of the circles represents *A*, and the other represents *B*. Ideas, properties, and characteristics that relate only to *A* are listed in the part of the *A* circle that does not overlap with the *B* circle. Ideas, properties, and characteristics that relate to both *A* and *B* are listed in the overlapping portion. And finally, ideas, properties, and characteristics that relate only to *B* are listed in the non-overlapping portion of the *B* circle. Therefore, a Venn diagram that consists of "congruent Venn circles," would represent a comparison of two entirely identical items.

5

While the parties agree on the test, they each set out to compare different "Venn circles." De Bruhl-Daniels compares count 15 to counts 25–28, noting that the two Venn circles are not congruent because, despite charging the same statutory offense, they involve entirely different conduct. Dkt. 311 at 7. The Government compares the "course of conduct" detailed in the complaint to the course of conduct from which the facts supporting counts 15 and 25–28 are drawn. Dkt. 316 at 2–3. That is, De Bruhl-Daniels looks to the specific conduct underlying the charges in each indictment, while the Government suggests that each accusatory document is really charging the exact same conduct regardless of the specific facts supporting the counts.

In order to determine who is correct, it is important to locate where this situation fits in Fifth Circuit precedent on this issue. In *Phipps*, the Fifth Circuit divided all cases involving thirty-day rule STA violations into two categories. *United States v. Phipps*, 319 F.3d 177, 182 (5th Cir. 2003). The first category comprises cases where "a defendant is charged in a complaint, arrested, and timely indicted for the offense charged in the complaint." *Id.* Thereafter, "a superseding indictment charges new offenses not contained in the complaint." *Id.* In the second category, "a defendant is charged in a complaint, arrested, and timely indicted for an offense not charged in the complaint." *Id.* Then, after the thirty-day STA period has expired, "a superseding indictment alleges the offense charged in the complaint." *Id.*

The present matter is more like situations in the second category ("Category Two") because the superseding indictment charges offenses found in the complaint. This case is different, however, because the middle indictment also charges conduct found in the complaint. In other words, all three documents charge violations of the same statute, but the *counts* found in the relevant indictments are predicated on different conduct (but all conduct was included in the

6

complaint).   To illustrate the difference, consider two cases cited in *Phipps* as belonging to Category Two: *Martinez-Espinoza* and *Perez*.

In *Martinez-Espinoza*, a man was charged in a complaint with "attempting to enter" the United States under 18 U.S.C. § 1326(a)(2).  *Martinez-Espinoza*, 299 F.3d at 415 & n.1.  Then, he was indicted under a different provision of the same statutory section for being "found in" the United States.  *Id.*  Finally, a superseding indictment charged him with "attempting to enter," as initially charged in the complaint.  *Id.* at 416.  The Fifth Circuit relied on another decision that distinguished the facts necessary to prove violations of each provision and concluded that they were not the "same offense."  *Id.* at 417.  Therefore, dismissal was required because the first indictment ("found in") did not toll the thirty-day STA clock for the charge in the superseding indictment ("attempting to enter"), so the superseding indictment was untimely.  *Id.* at 417–18.

In *Perez*, a man was charged in a complaint with aiding and abetting a codefendant in "harboring 'an alien.'"  *Perez*, 217 F.3d at 325.  Although the complaint did not name a specific alien, an affidavit attached to the complaint explained that the charge was related to twenty-four aliens arrested where Perez lived.  *Id.*  Later, Perez was indicted for one count of harboring a particular undocumented alien, Merced Caletre-Flores.  *Id.*  Finally, a superseding indictment charged Perez with two counts of harboring two different undocumented aliens, Jose Amado Aguilar-Jimenez and Jose Chevez-Nolasco.  *Id.*  The Fifth Circuit concluded that, despite naming different undocumented aliens in each indictment, the first indictment tolled the STA clock for the charges contained in the superseding indictment.  *Id.* at 329.  In doing so, it noted that other circuits that had grappled with this issue had held that "where the superseding indictment adds no new facts and contains charges identical to those in the original timely indictment, the filing of the first indictment tolls the speedy trial 'clock.'"  *Id.* at 328.

It explained further that the thirty-day rule has two purposes: (1) to prevent indefinite detention without charges; and (2) to give the defendant "formal notice of the charge against which he must prepare to defend himself." *Id.* at 329. The court believed its decision satisfied both of these concerns. *Id.* In reasoning critical to its decision, the court wrote that "the timely filing of the first indictment reflects the prosecution's decision to charge Perez *in connection with the events that transpired at the 8505 Lenore Street residence on March 19, 1998*." *Id.* (emphasis added). That is, even though the superseding indictment had two counts instead of one and each count named a different alien than the alien named in the first indictment, all counts were predicated on the same events that occurred at the same location on the same day. The court concluded that all documents charged the same offense and therefore the STA clock was tolled by the first indictment. *Id.*

The case before the court is different from the cases found in Category Two for two reasons. First, unlike the instant case, *Martinez-Espinoza* entailed charging documents that charged offenses so different from one another that they easily satisfied the *Blockburger* different-elements test. Second, in *Perez*, where the offenses charged were all for the same statutory violation, but contained factual differences, the charges were still based on conduct that was tightly confined in time and space (same address/day/circumstances). Here, the statutory violation is the exact same in the complaint, second superseding indictment, and fifth superseding indictment. In that way, it is more like *Perez* than *Martinez-Espinoza*. Here, however, the complaint covers (and describes in an attached affidavit) conduct spanning from June 1, 2016 to September 12, 2018. The second superseding indictment charges conduct related to only the disclosure of information by De Bruhl-Daniels to Diya during that time period. And the fifth superseding indictment adds

conduct relating to interviews with the FBI and other federal agents—conduct that all occurred on a single day in December 2017.

Because of the differences enumerated above, the present case occupies either a separate, third category or a special subset of Category Two.  This third category covers cases involving a complaint charging a statutory violation supported by conduct spanning a broad range of dates, locations, and circumstances, an indictment charging the same statutory violation but predicated on only a subset of the conduct from the complaint, and a superseding indictment charging the same statutory violation but adding counts predicated on an entirely different subset of conduct from the complaint—a subset removed by time, distance, or circumstance.

When the court in *Perez* was faced with a novel situation that did not quite fit into this circuit's precedent—and its "same offense" *Blockburger* test—it turned to the purpose behind the thirty-day rule to guide its resolution of the matter.  *Id.* at 329.  Here, the court will do the same. As previously mentioned, the thirty-day rule serves the dual purpose of (1) preventing indefinite detention without charges; and (2) giving the defendant "formal notice of the charge against which he must prepare to defend himself."  *Id.*

The first purpose is less relevant here because De Bruhl-Daniels was charged with *something* within thirty days of the filing of her complaint.  She was not detained for longer than the statutory maximum without *any* charges.

The second purpose creates a bigger problem for the Government.  The court in *Perez* noted that the first indictment "reflect[ed] the prosecution's decision to charge Perez in connection with the events that transpired at the 8505 Lenore Street residence on March 19, 1998."  *Id.*  Again, all three documents in that case charged the same conduct occurring at the same location on the same day.  The superseding indictment merely chose two different names from the twenty-four

aliens that were found at that location on that day.  Here, however, the fifth superseding indictment charged conduct of a very different nature from that in the second superseding indictment.  The former related to De Bruhl-Daniels disclosing information to Diya over a two-year period, while the latter concerned allegations of troubling FBI interview conduct and her role in coaching Diya for his interview with federal agents—both occurring on December 18, 2017.  The charge in the second superseding indictment—count 15—was insufficient to give De Bruhl-Daniels "formal notice" of the charges in the fifth superseding indictment—counts 25–28.  Therefore, counts 25–28 must be dismissed.

### 2.  *With or Without Prejudice*

If dismissal is required under the STA, the court's inquiry then turns to whether the charges should be dismissed with or without prejudice.  "[T]he decision whether to dismiss a complaint under the Speedy Trial Act with or without prejudice is 'entrusted to the sound discretion of the district judge and . . . no preference is accorded to either kind of dismissal.'"  *United States v. Clark*, 577 F.3d 273, 281 (5th Cir. 2009) (alteration in original) (quoting *United States v. Melguizo*, 824 F.2d 370, 371 (5th Cir. 1987)).  The STA requires the court to consider "[(1)] the seriousness of the offense; [(2)] the facts and circumstances of the case which led to the dismissal; and [(3)] the impact of reprosecution on the administration of [the STA] and on the administration of justice."  18 U.S.C. § 3162(a)(1).  "The defendant has the burden of proving that dismissal of his [or her] case pursuant to these factors is appropriate."  *United States v. Blevins*, 142 F.3d 223, 225 (5th Cir. 1998).

### i.  *Seriousness of the Offense*

The Fifth Circuit has embraced the idea that there is no mechanical test for the court to apply in determining the seriousness of a particular crime, but instead the court should "carefully consider the gravity of [the] alleged crimes."  *Clark*, 577 F.3d at 282.  Some decisions hold that

the possibility of a long sentence means a crime is serious.  *See Martinez-Espinoza*, 299 F.3d at 418 & n.10 (crimes with a 10–20 year maximum sentence are serious).  Another decision suggested that "nonviolent crimes involving mendacity" are serious.  *Clark*, 577 F.3d at 282 & n.1 (listing as crimes of mendacity tax fraud, bank fraud, perjury, failure to file currency transaction reports, and wire fraud).

De Bruhl-Daniels contends that although the Government alleges she provided information to the target of a terrorism investigation and concealed information from federal officers, her case is "not as serious as other cases involving terrorism."  Dkt. 311 at 9.  To support this claim, she indicates that Diya was not indicted on any terrorism charges and was even successful in seeking to have his GPS monitor removed after release from custody.  *Id.*  The Government does not respond directly but, in a discussion of prejudice, mentions that the charges De Bruhl-Daniels is facing are "serious allegations."  Dkt. 316 at 4.

The charges dismissed by the court in this order are violations of 18 U.S.C. § 1512(c)(2), each of which carries a maximum penalty of twenty years imprisonment.  *See* 18 U.S.C. § 1512(c)(2).  The Government alleges that De Bruhl Daniels concealed information from federal law enforcement officers, a crime that easily fits into the group of nonviolent crimes of mendacity listed above.  It also alleges that De Bruhl-Daniels prepared the target of federal criminal and counterterrorism investigations for his interview with federal agents.  These allegations are no doubt grave.  It does not matter that Diya was only convicted of passport offenses, as De Bruhl-Daniels points out, or that other cases involving terrorism may be more serious.  The court finds that the allegations in counts 25–28 are serious and weighs this factor in favor of dismissing without prejudice.

*ii.  Facts and Circumstances Leading to Dismissal*

The second factor "requires consideration of the Government's reason for having violated the Act." *United States v. Mancia-Perez*, 331 F.3d 464, 468 (5th Cir. 2003) (citing *Martinez-Espinoza*, 299 F.3d at 418).  At first, the burden is on the Government to produce an explanation for the delay, but then it shifts to the defendant, who has an opportunity to prove that the Government's explanation is pretextual.  *Id.* (citations omitted).  But when the Government offers no explanation for the delay, it is "assumed that the delay was unjustified and that the second factor weigh[s] in favor of dismissal with prejudice."  *Id.* at 469 (citing *United States v. May*, 819 F.2d 531, 533 (5th Cir. 1987)).

In support of her claim that the second factor favors dismissal with prejudice, De Bruhl-Daniels cites the fact that there have been many superseding indictments, the last three of which were each filed around thirty days before trial.  Dkt. 311 at 9.  The Government has not offered any explanation for the delay.  Dkt. 316 at 4.  Instead, it simply insists there is no evidence that the superseding indictments were sought for "an ulterior purpose," or that any failure to meet deadlines was "repetitive, regular, or frequent."[1]  *Id.* at 4 (quoting *Mancia-Perez*, 331 F.3d at 469).

Because the Government has offered no explanation for failing to satisfy the requirements of the STA's thirty-day rule, the court assumes it was unjustified and weighs this factor in favor of dismissal with prejudice.

---

[1] The Government references the standard used when the Government offers negligence as a reason for the delay.  *See Mancia-Perez*, 331 F.3d at 469.  Because it has not explained the delay, the inquiry it referred to is irrelevant and the delay is assumed to be unjustified. *See id.*

      *iii. Impact of Reprosecution on the Administration of the STA and the Administration*

        *of Justice*

The last factor "encompasses three concerns: [t]he defendant's right to a timely trial; the deterrent effect of a prejudicial dismissal on the Government's repeated violations of the speedy trial requirements; and the public's interest in bringing the accused to trial." *Mancia-Perez*, 331 F.3d at 469 (quoting *Blevins*, 142 F.3d at 226). Also relevant is the "presence or absence of prejudice to the defendant." *Id.* (citing *United States v. Taylor*, 487 U.S. 326, 334, 108 S. Ct. 2413 (1988)).

De Bruhl-Daniels argues that she has been ready for trial three times, but that each time the setting was disrupted by a superseding indictment, denying her a timely trial. Dkt. 311 at 9. She contends that deterrence is necessary in light of "repeated delays." *Id.* She offers no thoughts on the final concern (the public's interest). With respect to prejudice, although not addressed in this subsection, De Bruhl-Daniels has asserted elsewhere in her motion that she "tailored her defense to the allegations in the [second superseding] indictment," and that when the Government added charges at a "late stage," it forced her to "rework her defense theory." *Id.* at 7–8. The Government argues that De Bruhl-Daniels has known about the Government's allegations since 2018, and therefore questions her claims of prejudice. Dkt. 316 at 4.

There is no doubt that De Bruhl-Daniels's right to a timely trial on counts 25–28 was compromised. She was not indicted on those counts until more than a year after a criminal complaint was filed against her detailing the relevant conduct. This weighs in favor of a dismissal with prejudice.

The second concern regards deterring the Government from "repeated speedy trial violations." First, the court disagrees with De Bruhl-Daniels's assertion that there were "repeated

delays" relevant to this analysis.  The motion before the court deals only with the Government's failure to indict De Bruhl-Daniels on counts 25–28 in a timely fashion.  Technically, this is only one delay and certainly only one STA violation.  Because there was only one relevant delay, this factor must weigh in favor of dismissal without prejudice.  There can be no deterrence of the Government's repeated delays if there was only one delay.[2]

Before turning to any prejudice the defense may have experienced, the court must assess the public's interest in bringing the accused to trial.  Typically, this factor turns with the seriousness of the crime, but criminal history and likelihood of recidivism are important as well.  *See, e.g.*, *Blevins*, 142 F.3d at 225.  As explained above, the crimes that the Government accuses De Bruhl-Daniels of perpetrating are very serious.  The Government alleges that she used her federal position to obstruct ongoing criminal and counterterrorism investigations by relaying sensitive information to the target of those investigations and then lying to the FBI about it.  It does not matter whether "this case is not as serious as other cases involving terrorism," as De Bruhl-Daniels argues, because regardless of the specific facts of this case, the behavior charged involves an appreciable risk to national security.  The public's interest is high in ensuring this type of behavior is prosecuted.  On the other hand, the Government has made no argument regarding De Bruhl-Daniels's criminal history, she has been removed from her position at NCIS (making the risk of recidivism unlikely), and she will still be prosecuted on some of the conduct alleged regardless of the outcome of this motion.  On balance, this concern weighs in favor of dismissal without prejudice.

---

[2] While evidence of repeated STA violations across many cases can also support the need for the deterrent effect of a dismissal with prejudice, De Bruhl-Daniels makes no allegation of a pattern of this nature.  *See, e.g.*, *Mancia-Perez*, 331 F.3d at 470 ("Mancia does not dispute in his original brief, that the government did not engage in a pattern of untimely illegal reentry indictmens."); *Martinez-Espinoza*, 299 F.3d at 419 ("There is nothing to indicate that the government repeatedly violates the STA.").

Finally, the court is unconvinced that the defense has been prejudiced by the delay in indicting De Bruhl-Daniels on counts 25–28. Despite potentially having to "rework her defense theory at a late stage," De Bruhl-Daniels has not shown that her defense has been impaired by the delay, the "most serious type of prejudice." *See United States v. Blank*, 701 F.3d 1084, 1090 (5th Cir. 2012). While lack of formal notice of the charges against her is enough to tip the scales in favor of dismissal in the STA analysis above, it is not enough to establish prejudice to the defense, and therefore this concern weighs in favor of dismissal without prejudice.

While the defendant's right to a speedy trial has been impaired, due to the high public interest in bringing De Bruhl-Daniels to trial on these charges and the failure of the defense to establish any pattern of STA violations on behalf of the Government or any prejudice to its case, the third factor weighs in favor of dismissal without prejudice.

### iv. Balancing the Factors

The only factor weighing in favor of dismissal with prejudice is the second factor, the facts and circumstances leading to dismissal. This factor only weighs in favor of dismissal with prejudice because the Government failed to provide any reason for its delay in charging De Bruhl-Daniels with counts 25–28. Because the court finds that the offenses charged in those counts are serious and that reprosecution would not frustrate the administration of the STA or the administration of justice in this case, dismissal without prejudice is the appropriate sanction. Accordingly, counts 25–28 are dismissed without prejudice.

### III. MOTION TO DISMISS COUNTS 15, 25–28, AND 36–37

De Bruhl-Daniels next moves the court to dismiss counts 15, 25–28, and 36–37 because, she argues, they fail to state an offense. Dkt. 312.

A. *Legal Standard*

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It is critical to the sufficiency of an indictment that "each count contain[] the essential elements of the offense charged." *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986).

B. *Analysis*

1. *Scope of § 1512(c)(2)*

De Bruhl-Daniels argues that counts 15, 25, 26, 27, 28, 36, and 37 must be dismissed because they fail to state an offense. In her view, the breadth of § 1512(c)(2) is limited by language in § 1512(c)(1), which punishes obstructive behavior concerning "a record, document, or other object." 18 U.S.C. § 1512(c)(1). Reading the two provisions together, she asserts that tampering with tangible evidence is an essential element of a § 1512(c)(2) violation. Dkt. 312 at 1–2. Therefore, because the counts listed above do not allege that De Bruhl-Daniels tampered with any tangible evidence, she contends that they must be dismissed as insufficient. *Id.* The Government insists that § 1512(c)(2) should be read independently from § 1512(c)(1). Dkt. 317 at 3. It argues that § 1512(c)(2) "is a catch-all clause that . . . reaches all manner of obstructive conduct." *Id.* at 2.

The scope of § 1512(c)(2) remains an open question in the Fifth Circuit. That is not so for other courts of appeals. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) ("The expansive language in this provision operates as a catch-all to cover 'otherwise' obstructive behavior that might not fall within the definition of document destruction."); *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (following *Burge*); *United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015) ("While we acknowledge that § 1512(c)(1) is limited to obstruction relating to 'a record, document, or other object,' § 1512(c)(2) is not so limited. Section

1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different . . . manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents or records.").

At least four district courts from other circuits have squarely addressed the issue as well, finding, with two exceptions, that § 1512(c)(2) reaches all manner of obstructive conduct, regardless of its connection to a document or tangible object. *See United States v. Ying Lin*, 270 F. Supp. 3d 631, 636 (E.D.N.Y. 2017) ("The plain language of the statute makes clear that § 1512(c)(2) criminalizes all obstructive conduct, not merely acts of tampering with tangible objects."); *United States v. Kumar*, No. 04 CR 846(S–2)(ILG), 2006 WL 6589865 (E.D.N.Y. Feb. 21, 2006); *United States v. Ring*, 628 F. Supp. 2d 195, 225 (D.D.C. 2009) (adopting the reasoning from *Kumar* and holding that "§ 1512(c)(2)'s application is not limited to the destruction of documents"). *But see United States v. Singleton*, No. H-06-080, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (Atlas, J.) (requiring "some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *United States v. Hutcherson*, No. CRIM. 605CR00039, 2006 WL 270019, at *2 (D.W. Va. Feb. 3, 2006) ("If an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object, such person violates this subsection."). It appears, then, that the most popular—and increasingly prevalent—interpretation of § 1512(c)(2) is that it is an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items.

The court finds that the text of the statute clearly supports the view that § 1512(c)(2) stands alone. Section 1512(c) reads:

> Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years.

18 U.S.C. § 1512(c).

"The task of statutory interpretation begins and, if possible, ends with the language of the statute." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964 (5th Cir. 2019) (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013)). "When the language is plain, we 'must enforce the statute's plain meaning, unless absurd.'" *Id.*

De Bruhl-Daniels centers her argument around the word "otherwise." Appealing to the *noscitur a sociis* canon of construction, a collection of cases, and common sense, she argues that this word should be construed to limit what follows by its association with what came before. Dkt. 312 at 2. Because the previous subsection prohibits obstructive acts related to "record[s], document[s], or other object[s]," she concludes that § 1512(c)(2) must only prohibit "similar ways of obstructing by tampering with physical evidence." *Id.* at 2. The Government responds by contending that § 1512(c)(2) "contains an independent prohibition, not merely an additional term following a list set forth in [§ 1512(c)(1)]." Dkt. 317 at 3.

The court agrees with the Government. Here, § 1512(c)(2) is not merely a catch-all term at the end of a list of other terms. It is indeed an entirely different subsection, separated from the first subsection by a semicolon, the word "or," and the word "otherwise." The first half clearly prohibits specific conduct: altering, destroying, mutilating or concealing records, documents, or other objects with the intent to frustrate their use in an official proceeding. Then, following the

semicolon and the word "or," a wholly separate and much broader prohibition emerges. The second half prohibits "otherwise obstruct[ing], influenc[ing], or imped[ing] any official proceeding." The second half does not appear as a broad catch-all term at the end of a list that must be wrangled into conformity with congressional intent using a canon of construction. Rather, it exists as a potent, independent, and unequivocal catch-all provision that reaches all manner of obstructive conduct related to an official proceeding.

DeBruhl-Daniels also supports her argument with a substantial discussion of the legislative history behind § 1512. Dkt. 312 at 6–10. Because the language of the statute is unambiguous and its meaning is easily discerned from that language, the court has no reason to resort to the legislative history. *See Lauderdale Cnty.*, 914 F.3d at 966 n.12 ("In construing a statute, it is our duty to evaluate the text that was actually enacted into law by both houses of Congress and the President. We will not go down the rabbit hole of attempting to divine the intent of Congress as a whole based on" statements of individual legislators.).

Turning back to the question of dismissal, the court must deny DeBruhl-Daniels's motion because it is based on an interpretation of § 1512(c)(2) that is contrary to the plain language of the statute. There is no requirement that an indictment for obstruction under § 1512(c)(2) allege that a defendant tampered with a tangible object. Therefore, DeBruhl-Daniels's argument that counts 15, 25–28, and 36–37 fail to state an offense because they do not allege that she tampered with tangible objects is inapposite.

### 2.  *Rule of Lenity*

The final argument that DeBruhl-Daniels makes in her effort to dismiss counts 15, 25–28, and 36–37, is that the rule of lenity requires dismissal. Dkt. 312 at 10. She suggests that: "At the very least, the issue is subject to doubt. And where a criminal statute contains ambiguity, 'doubts are [to be] resolved in favor of the defendant.' *Id.* at 10 (alteration in original) (citations omitted).

Her argument is inapplicable here, though. "[T]he rule of lenity only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the [c]ourt must simply guess as to what Congress intended." *United States v. Suchowolski*, 838 F.3d 530, 534 (5th Cir. 2016) (alterations in original) (quoting *United States v. Castleman*, 572 U.S. 157, 172–73, 134 S. Ct. 1405 (2014)).   There is no such "grievous ambiguity" here.  The court did not need to guess at what Congress intended, but rather was able to discern a clear rule from the plain language of the statute.

### IV. MOTION TO STRIKE

Finally, De Bruhl-Daniels asks the court to strike what she calls "vague terrorism language" from counts 21–24 and 32–34.  Dkt. 313.

#### A.  Legal Standard

Under Federal Rule of Criminal Procedure 7(d), the court may strike language from an indictment upon a defendant's motion if it is surplusage.  Fed. R. Crim. P. 7(d).  Language that alleges facts "beyond those which comprise the elements of the crime" is surplusage.  *United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010) (citing *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992)).  The court may strike surplusage on a defendant's motion only if it is "irrelevant, inflammatory, and prejudicial."  *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) (citing *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971)).  This is an exacting standard that is only rarely met.  1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* § 128 (4th ed. 2008).

#### B.  Analysis

De Bruhl-Daniels asks the court to strike language from counts 21–24 and 32–34 that mirrors a sentencing provision in the statute under which she is charged.  Dkt. 313 at 2.  Each of

these counts charges De Bruhl-Daniels with making false statements in violation of 18 U.S.C. § 1001(a).  Dkt. 274 at 12–14, 19–21.  One who violates this subsection is subject to a statutory maximum sentence of five years in prison.  18 U.S.C. § 1001(a).  But "if the offense involves international or domestic terrorism," the statutory maximum sentence is increased to eight years.  *Id.*  Each of these counts includes identical language alleging that De Bruhl-Daniels's conduct subjects her to the increased maximum: "This offense involved international and domestic terrorism as defined in Title 18, United States Code, Section 2331."  Dkt. 274.  De Bruhl-Daniels moves the court to strike this language from the specified counts on the basis that it is unconstitutionally vague as applied to her situation.  Dkt. 313 at 1.  She does not include in her motion, however, any legal basis upon which this court could grant her motion.

### 1.  *Surplusage*

As explained above, there is no rule in the Federal Rules of Criminal Procedure that specifically permits a court to strike language from an indictment for the reason given.  The only permissible basis is that the language is irrelevant, inflammatory, and prejudicial surplusage.  Therefore, the court will first analyze the defendant's motion as a motion to strike surplusage.  Because the language challenged by De Bruhl-Daniels is relevant, her motion must be denied.  *See United States v. Markham*, No. 3:12–CR–159–D(3), 2013 WL 705113, at *5 (N.D. Tex. Feb. 27, 2013) ("The court will not strike allegations that are relevant, no matter how prejudicial or inflammatory they may be to the defendant.").

First, the court notes that the sentencing provision is barely even surplusage.  In a sense, it is simply the fifth element of an enhanced § 1001(a) violation.  *See Apprendi v. New Jersey*, 530 U.S. 465, 490, 120 S. Ct. 2348 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury, and proved beyond a reasonable doubt.").[3]  A basic violation of § 1001(a) requires a jury finding: (1) that the defendant made a false statement to a federal government entity; (2) that the defendant knew it was false; (3) that the statement was material; and (4) that the statement was made willfully to mislead the government entity.  Comm. on Pattern Jury Instructions, Dist. Judges Ass'n Fifth Cir., *Pattern Jury Instructions (Criminal Cases)* § 245 (2019).  The statutory maximum prison sentence for a basic violation is five years imprisonment.   18 U.S.C. § 1001(a).   An enhanced violation of § 1001(a) requires an additional jury finding that the conduct involved terrorism.  *Id.*  An enhanced violation carries an increased statutory maximum of eight years.  *Id.* Because surplusage only encompasses facts "beyond those which comprise the elements of the crime," it is a close call whether this language is surplusage at all.  *Valencia*, 600 F.3d at 432 (citing *Robinson*, 974 F.2d at 578).

Nonetheless, the language at issue should not be stricken because it is relevant.  Whether inflammatory or prejudicial, relevant language in an indictment may not be stricken.   The Government has alleged that De Bruhl-Daniels lied about, or concealed information related to, her interactions with Diya, the target of, among other investigations, a counterterrorism investigation. Therefore, allegations that the § 1001(a) violations she is accused of involved international and domestic terrorism are certainly relevant.  For this reason, the language in counts 21–24 and 32– 34 challenged by De Bruhl-Daniels may not be stricken on the basis that it is surplusage.

2.  *Vagueness Challenge*

Even though De Bruhl-Daniels has provided no legal support for her ability to bring a vagueness challenge to portions of certain counts in the indictment using a motion to strike, the court nonetheless finds that the challenged language is not unconstitutionally vague.

---

[3] In fact, the Government argues that *Apprendi* requires it to allege in the indictment that De Bruhl-Daniels's conduct involved terrorism, and to submit that fact to the jury.  Dkt. 315 at 1.  The court agrees.

The Government violates the Due Process clause of the Fifth Amendment by "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595, 135 S. Ct. 2551 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S. Ct. 1855 (1983)). When a vagueness challenge does not involve the First Amendment, it "must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S. Ct. 710 (1975). "These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Johnson*, 576 U.S. at 596.

De Bruhl-Daniels makes two basic assertions about the vagueness of the provision at issue: (1) it is "so standardless and imprecise as to allow prosecutors and judges, not Congress, to define its meaning"; and (2) diverse interpretations "fail to give ordinary people fair notice of the conduct covered by this penalty provision." Dkt. 313 at 6–7. Particularly, she takes issue with the words "involve" and "terrorism," insisting they are vague as applied to her case.

First, De Bruhl-Daniels argues that the word "involves" is susceptible of differing meanings, rendering the word too vague for use in this provision. *Id.* She and the Government principally agree on the various meanings of the word, offering as definitions: "to include"; "to have within or part of itself"; "to require as a necessary accompaniment"; "to affect"; "to relate closely"; or "to entail." *See id.*; Dkt. 315 at 3–4; *see also Merriam-Webster's Collegiate Dictionary* 660 (11th ed. 2007) (listing all of these meanings). But whereas De Bruhl-Daniels concludes that the varying definitions of "involve" fail to give an ordinary person fair notice of the conduct covered by the "involves . . . terrorism" provision, the Government reaches the opposite result. The Government contends that the meaning of "involve" is commonly understood by those

23

who know English.  Dkt. 315 at 3–4.  The court agrees with the Government.  The definitions offered by the parties are not materially different from one another.  A person of ordinary intelligence understands that "*X involves Y*" means that there is some non-trivial link between *X* and *Y*.

The court now turns its attention to the word "terrorism."  In the provision at issue, terrorism is defined by reference to 18 U.S.C. § 2331.  18 U.S.C. § 1001(a).  Section 2331 defines terrorism to include, whether committed domestically or internationally: (1) "violent acts or acts dangerous to human life"; (2) intended "to intimidate or coerce a civilian population"; "to influence the policy of a government by intimidation or coercion"; or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  *Id.* § 2331(1), (5).  De Bruhl-Daniels does not argue that this definition is vague.  The crux of her argument is that the conduct she is charged in counts 21–24 and 32–34 with committing does not fit within the scope of this definition of terrorism,[4] and therefore the Government has unconstitutionally erred in alleging that her conduct *involved* terrorism.  Dkt. 313 at 9.  Indeed, she claims that the alleged false statements "look nothing like terrorism," and that "most . . . don't even look related to terrorism."  *Id.* at 9.  The Government believes that whether the false statements alleged involve terrorism is a question for the jury to decide.  *See* Dkt. 315 at 5 ("We would . . . expect each side to argue their case about why the offense did or did not involve international or domestic terrorism," and the jurors "would be free to accept or reject either side's argument on this point.").

The court concludes that the sentencing provision at issue here is not unconstitutionally vague because it "provide[s] a person of ordinary intelligence fair notice of what is prohibited," and is not so standardless that it invites arbitrary enforcement.  *See United States v. Williams*, 553

---

[4] She does concede, however, that "perhaps a couple" of her statements "arguably 'relate to' terrorism."  Dkt. 313 at 9.

24

U.S. 375, 304, 128 S. Ct. 1830 (2008).  A person of ordinary intelligence could easily conclude that the conduct alleged falls well within the bounds of the phrase "involves . . . terrorism." De Bruhl-Daniels allegedly learned in February 2017 of an Inter Agency Counter Terrorism red flag regarding Diya, in addition to other adverse "terrorism-related" information indicated by DHS.  Dkt. 1 ¶ 8.  Later, in May 2017, she was informed of an ongoing FBI counterterrorism investigation into Diya.  *Id.* ¶ 14–15.  She was alerted to this counterterrorism investigation again in July 2017.  *Id.* ¶ 17–18.  She then informed Diya that he was the target of this counterterrorism investigation.  *Id.* ¶ 19.  It was not until months later that she, knowing the relevant details listed above, allegedly made the false statements charged in counts 21–24 (December 18, 2017) and 32–34 (April 24, 2018).

In those statements, De Bruhl-Daniels is alleged to have:

- Concealed her sexual and personal relationship with Diya (count 21)

- Concealed that Diya had given her $1,400 (count 22)

- Concealed that Diya promised to give her son a job (count 23)

- Concealed that she told Diya he was the target of several federal investigations, including the FBI counterterrorism investigation (count 24)

- Represented that she had not had any contact with "country nationals" (count 32)

- Represented that she had no intimate relationships with foreign nationals to report (count 33)

- Represented that she was not aware of any compromise of classified/sensitive information (count 34)

Dkt. 274 at 13–14, 19–21.  So, while De Bruhl-Daniels avers that these alleged false statements "don't even look related to terrorism," a person of ordinary intelligence should be able to conclude

that they might fall within the scope of the "involves . . . terrorism" sentencing provision of § 1001(a).  Likewise, the provision gives judges, juries, and prosecutors a clear, adequate standard that prevents arbitrary or discriminatory enforcement.  For these reasons, the sentencing provision at issue here is not unconstitutionally vague as applied to DeBruhl-Daniels's case.  Accordingly, her motion to strike language mirroring the provision from counts 21–24 and 32–34 of the indictment is DENIED.

## V. CONCLUSION

De Bruhl-Daniels's motion to dismiss counts 25–28 under the STA (Dkt. 311) is GRANTED.  Accordingly, counts 25–28 of the sixth superseding indictment are DISMISSED WITHOUT PREJUDICE.  De Bruhl-Daniels's motion to dismiss counts 15, 25–28, and 36–37 for failure to state an offense (Dkt. 312), and motion to strike (Dkt. 313) are DENIED.

Signed at Houston, Texas on September 30, 2020.

_____
Gray H. Miller
Senior United States District Judge