# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

United States Courts
Southern District of Texas
FILED
*November 08, 2024*
Nathan Ochsner, Clerk of Court

No. 22-20650

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee,*

*versus*

Leatrice Malika De Bruhl-Daniels,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-199-5

Before Jones, Clement, and Wilson, *Circuit Judges.*

Cory T. Wilson, *Circuit Judge*:

Federal agent Leatrice De Bruhl-Daniels (De Bruhl) purportedly sought to develop an individual with suspected terrorist ties into an intelligence source while she was stationed in Dubai. Along the way, she accepted gifts and favors and began a romantic relationship with him, despite being warned by her consulate coworkers to keep her distance. Instead of developing a source, she became one: She tipped her paramour off about an ongoing counterterrorism investigation into his activities and then lied to federal investigators about doing so. Today's case deals with the aftermath.

No. 22-20650

Following a jury trial, De Bruhl was convicted of twelve counts relating to her conduct and sentenced to 108 months' imprisonment. On appeal, De Bruhl challenges four of her convictions—one based on making false statements involving international terrorism (Count 24), and three based on obstructing an official proceeding (Counts 15, 36, and 37)—as well as her overall sentence. She contends that (1) providing false statements about her involvement with the investigation target does not "involve" international terrorism under 18 U.S.C. § 1001(a); (2) § 1001(a)'s sentencing enhancement is unconstitutionally vague; and (3) the scope of 18 U.S.C. § 1512(c)(2) does not encompass her conduct.

Her initial two arguments fail. Sufficient evidence supports the jury's finding that De Bruhl's coverup involved international terrorism, such that § 1001(a)'s enhancement applies; and § 1001(a) is not unconstitutionally vague. However, her third challenge succeeds, given the Supreme Court's recent decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024). We therefore affirm De Bruhl's conviction on Count 24 but vacate as to Counts 15, 36, and 37. Because the vacated convictions likely influenced De Bruhl's sentence, we also vacate her sentence and remand for resentencing.

## I.

### A.

De Bruhl served as a special agent with the Naval Criminal Investigative Service (NCIS). While stationed at the United States Consulate in Dubai, she met a Syrian national named Nadal Diya. De Bruhl's relationship with Diya began professionally, then became personal, and ultimately developed into a romantic one. During their relationship, De Bruhl divulged confidential information to Diya, despite repeated warnings from colleagues about her entanglement with Diya and the risks of such disclosures.

No. 22-20650

Diya was a person of interest to various agencies of the United States years before he met De Bruhl. In 2013, Homeland Security Investigations (HSI) and the Department of Commerce initiated a counterproliferation investigation into Diya and his business associate, Labib Arafat.[1] That investigation uncovered that the two men were using several companies to funnel illicit shipments of oilfield equipment from the United States to Iran.

In July 2014, the Federal Bureau of Investigation (FBI) launched fraudulent passport and counterterrorism investigations into Diya and Arafat.[2] The passport investigation revealed that Diya possessed a fake Guatemalan passport that Arafat provided to him. As for the counterterrorism investigation, the FBI suspected Arafat of supplying ambulances to the Islamic State in Iraq and al-Sham, better known as ISIS, and suspected that Diya was also involved. The Secretary of State has designated ISIS as a foreign terrorist organization that commits violent acts tailored to intimidate and coerce civilian populations and governments and are dangerous to human life in violation of domestic and foreign laws. 69 Fed. Reg. 75587 (Dec. 17, 2004).

During the FBI investigations, Diya applied for a visa to reenter the United States. His visa application was pending administratively with the State Department for over a year and a half. During that time, in June 2016, and while De Bruhl was still an active NCIS special agent in Dubai, De Bruhl dined with Diya in his home. Diya asked De Bruhl to help with his visa application, while also disclosing his ties to Arafat. De Bruhl asked if Diya would be willing to work with the United States government. After Diya

---

[1] Counterproliferation investigations fall under the National Security Division of HSI. Counterproliferation agents investigate the export of arms, ammunition, and other U.S. goods and services to foreign countries in violation of U.S. laws, embargoes, and sanctions.

[2] NCIS participated in the FBI's counterterrorism investigation.

No. 22-20650

agreed to cooperate, De Bruhl told him that she would look into his visa situation.

When De Bruhl broached Diya's visa with her colleagues and other law enforcement personnel, she expressed her desire to develop Diya as an intelligence source. They informed De Bruhl that Diya's visa would not be renewed due to his suspected ties to terrorism. And they warned her, repeatedly, to stay away from him.

Yet De Bruhl continued to deepen her relationship with Diya. She sought his phone number in February 2017. Then, throughout 2017 and early 2018, she spent time with Diya on his yacht, attended social events where he was present, and shared multiple private meals with him. She made various personal requests, asking Diya to give her son a job, to pay for a trip to Greece, and to host her birthday party at his house. She also asked Diya to keep their communications secret from everyone—including Diya's wife. Their relationship became romantic in June 2017, when De Bruhl invited Diya to her apartment and initiated sex with him.

Around the time of their June 2017 tryst, De Bruhl met with Diya on a beach, instructing him to leave his phone in his vehicle in case it was being monitored. During this rendezvous, De Bruhl told Diya that he was "on radar" with the United States government, that he and Arafat were the targets of an FBI counterterrorism investigation, and that Diya would be arrested if he returned to the United States. De Bruhl admitted to Diya that she knew she should not be telling him about the investigations.

Several agents met with De Bruhl on December 18, 2017, to debrief her on her contacts with Diya and advance their investigation of him. During this meeting, De Bruhl admitted to knowing about the pending investigations, but she flatly denied telling Diya about them. That same night, De Bruhl met with Diya to help him prepare for his own interview with

4

No. 22-20650

federal agents the next day.  Although Diya's interview was ostensibly to
advance his visa application, agents also intended to further the
counterterrorism investigation into his activities.  De Bruhl told Diya that
agents from the FBI, HSI, and the Department of Commerce would be in his
interview, and she asked Diya to keep her involvement secret.  As planned,
Diya met with agents on December 19, 2017, but he denied assistance from
any source other than his attorney.  The interview did not produce any
investigative breakthroughs.

In late April 2018, De Bruhl left Dubai for her next assignment, as a
four-star admiral's security advisor in Hawaii.  Though she left the Middle
East, she stayed in contact with Diya.  Around this time, an internal FBI
memo called De Bruhl's professional responsibility into question.  This
prompted the NCIS to revoke De Bruhl's Hawaii billet, as the agency viewed
her handling of classified information and access to senior leaders as a risk.
On May 1, 2018, De Bruhl called her NCIS mentor, seeking an explanation
for her reassignment; she also confessed, for the first time, her relationship
with Diya.

In response to that revelation, multiple NCIS agents interviewed De
Bruhl.  During a session on May 6, 2018, De Bruhl admitted to telling Diya
that he was under investigation by the FBI and that he would be arrested if
he returned to the United States.  That same month, Diya received a notice
that his visa application had been denied.  In September 2018, Diya was
arrested in Canada and extradited to the United States.  However, because
his initial arrest occurred in Canada, the FBI could not access Diya's phones
or laptops.

## B.

De Bruhl was arrested in Virginia in September 2018, mere days
before she planned to return to Dubai.  De Bruhl, Diya, Arafat, and others

5

No. 22-20650

were indicted in the criminal prosecution that forms the basis of this appeal. De Bruhl was charged with seventeen counts arising out of her conduct and convicted of twelve. Four of those are at issue: Counts 24, 15, 36, and 37.

Count 24 alleged that on December 18, 2017, De Bruhl violated 18 U.S.C. § 1001(a) "by providing statements to an FBI Special Agent that concealed she had informed Nadal Diya he was a target of several federal law enforcement investigations, including being the target of an FBI counter-terrorism investigation." In convicting De Bruhl of this charge, the jury found that the offense "involved international and domestic terrorism as defined in [18 U.S.C. § 2331]." Based on the jury's finding, the district court sentenced De Bruhl on Count 24 by applying the enhancement provided by § 1001(a) for offenses involving terrorism, which raised her potential maximum sentence from five years to eight years.

Counts 15, 36, and 37 alleged that De Bruhl corruptly attempted to obstruct, influence, and impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). Specifically, Count 15 charged De Bruhl with obstruction for informing Diya that he was the target of federal criminal investigations, Count 36 charged De Bruhl with obstruction for telling Diya that he would be arrested if he returned to the United States, and Count 37 charged De Bruhl with obstruction for informing Diya that Arafat was also an investigation target. The jury likewise convicted De Bruhl on these counts.

For sentencing, the district court bundled De Bruhl's twelve convictions pursuant to U.S.S.G. § 3D1.2(b), (d). From there, the court generally adopted the presentencing report's calculations, which factored in an elevated offense level triggered by § 1001(a)'s terrorism enhancement. The court sentenced De Bruhl to 108 months of imprisonment—the low end

No. 22-20650

of the recommended guidelines range—for each of counts 15, 35,[3] 36, and 37, to run concurrently.    For her remaining convictions, the district court sentenced her to shorter terms of imprisonment, also to run concurrently. Thus, in all, De Bruhl was to serve a total of 108 months in prison.

De Bruhl timely appealed.    After briefing was complete in this case, the Supreme Court granted certiorari in *Fischer v. United States*, 144 S. Ct. 2176 (2024), to consider the scope of § 1512(c)(2).    Pending the Court's decision in *Fischer*, which implicated De Bruhl's challenges to Counts 15, 36, and 37, we held oral argument on the other issues De Bruhl raises.    After *Fischer* was handed down, we ordered supplemental briefing as to its effect on De Bruhl's convictions.    All issues are thus ready for disposition.

## II.

De Bruhl asserts that the district court erred by:    (A) denying her motion under Federal Rule of Criminal Procedure 29 for a judgment of acquittal[4] as to Count 24's terrorism enhancement; (B) denying De Bruhl's pre-trial motion to strike the terrorism enhancement from Count 24 as unconstitutionally vague; and (C) denying De Bruhl's pre-trial motion to dismiss Counts 15, 36, and 37 for failure to state a claim under 18 U.S.C. § 1512(c)(2).    Finally, due to these alleged errors, De Bruhl contends that

---

[3] Count 35 charged De Bruhl with making false entries in her "Departure Briefing" completed as she left Dubai. In that document, she stated that she did not have any contact with country nationals during her tour of duty, and that she was not aware of any compromise of classified or sensitive information.    De Bruhl does not challenge her conviction or sentence on Count 35 in this appeal.

[4] Rule 29 allows a defendant to move for a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29. Such a motion may be made "[a]fter the [G]overnment closes its evidence or after the close of all the evidence." *Id.*

No. 22-20650

(D) her cumulative sentence for the remaining counts was improper and must be vacated. We address each issue in turn.

## A.

We begin with the district court's denial of De Bruhl's Rule 29 motion for a judgment of acquittal on Count 24. De Bruhl was convicted for concealing that she told Diya he was the target of a counterterrorism investigation. The jury found that her conduct involved international terrorism, such that the maximum potential sentence increased from five to eight years. *See* 18 U.S.C. § 1001(a). De Bruhl contests the jury's finding, asserting that the statutory language does not support application of the enhanced statutory maximum to the evidence adduced at trial.

Specifically, De Bruhl argues that in the context of § 1001(a), the word "involves" has a much narrower interpretation than the Government contends. According to De Bruhl, the mere proximity of a counterterrorism investigation is insufficient to show that De Bruhl's conduct *involved* international terrorism, particularly because that investigation never identified specific acts of violence or acts dangerous to human life. Moreover, she asserts that the evidence at trial was otherwise insufficient to sustain a conviction on this point. The district court rejected this argument, both when De Bruhl first raised it at the close of the Government's case and again when she renewed her motion for a judgment of acquittal before the case was sent to the jury. The district court did not err in its rulings.

We review "claims preserved through a Rule 29 motion de novo, but 'with substantial deference to the jury verdict.'" *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018) (quoting *United States v. Delgado*, 672 F.3d 320, 330–31 (5th Cir. 2012) (en banc)). In this posture, all evidence must be "viewed in the light most favorable to the [G]overnment and all reasonable inferences made in support of the verdict." *United States v. Lanier*, 879 F.3d

No. 22-20650

141, 145–46 (5th Cir. 2018).  And if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," this court must affirm the conviction.  *United States v. Grant*, 850 F.3d 209, 219 (5th Cir. 2017) (quoting *United States v. Vargas–Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc)).  Our "inquiry is 'limited to whether the jury's verdict was reasonable, not whether we believe it to be correct.'"  *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009) (quoting *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)).

The inquiry begins "as always, with the text of the statute."  *United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 1092 (2024).  Section 1001(a) provides:

> Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> >
> > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> >
> > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or, *if the offense involves international or domestic terrorism (as defined in [18 U.S.C. §] 2331), imprisoned not more than 8 years*, or both.

(Emphasis added).  Section 2331(1), in turn, defines "international terrorism" to mean activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any

9

No. 22-20650

State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--

    (i) to intimidate or coerce a civilian population;

    (ii) to influence the policy of a government by intimidation or coercion; or

    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Given the parameters set by this statutory text, the parties diverge on one critical point: the *degree* to which an offense must "involve" terrorism to trigger § 1001(a)'s enhancement. In De Bruhl's view, the statute's enhancement can only be triggered by a connection to specific acts of terrorism; the Government asserts that misconduct more generally linked to terrorism—e.g., compromising a counterterrorism investigation and then lying to cover it up—suffices. For support, both parties proffer dictionaries that define "involve" as meaning some level of connection between two things. *E.g.*, *Involve*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/involve (accessed October 2, 2024) (defining "involve" as "to require as a necessary accompaniment" and "to relate closely: [c]onnect"); *accord United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008) (quoting *United States v. Winbush*, 407 F.3d 703, 707 (5th Cir. 2005)) (construing 18 U.S.C. § 924(e)(2)(ii), which applies to convictions "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance," and holding that "the term 'involving' means 'related to or connected with'"). As the district

No. 22-20650

court determined, "the definitions [of 'involve'] offered by the parties are not materially different from one another." The problem is that they can be cast to support either side. And De Bruhl's reading cabins the statute too narrowly, while the Government's is too broad. Ultimately, with the statutory context as guide, the question is one of fact, for the jury to decide— just as happened here.

De Bruhl's position falters because she does not account for the full statutory scheme. *Cf. United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (quoting *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020)) ("But '[t]ext should never be divorced from context.'"). Essentially, she contends that she had to have lied about actual terroristic activities. She points out that here, she only tipped Diya off about an ongoing counterterrorism investigation and then concealed doing so—nothing falling within § 2331(1)'s delineation of "international terrorism" was ever substantiated. But "international terrorism" is itself not defined so narrowly by the statute. Rather, § 2331 encompasses activities that "involve" violent or dangerous acts, plainly sweeping in more than just terroristic acts themselves. Reading both statutes in tandem, this second use of "involve" broadens the universe of what is covered by § 1001(a)'s terrorism enhancement: To be convicted, a defendant's offense must *involve* an activity that *involves* a terroristic act under § 2331. Thus, De Bruhl's tipping Diya off that he and Arafat were targets of a counterterrorism investigation, and then concealing it, given the pair's suspected activities in support of Iran and ISIS—a designated terrorist organization, *see* 69 Fed. Reg. 75587 (Dec. 17, 2004)—were sufficiently related to international terrorism to submit the charge to the jury.

De Bruhl's argument that there was no connection to international terrorism because Diya was never charged or convicted of terroristic activities is unpersuasive. Indeed, it may well be that the counterterrorism

No. 22-20650

investigation did not substantiate more definitive links to terrorism *because* she disclosed to Diya both the investigation and that he would be arrested if he tried to re-enter the United States. De Bruhl cannot escape § 1001(a)'s reach by hindering the Government's very ability to uncover facts that could have further substantiated that her deception "involve[d] international . . . terrorism." And the statutes at issue do not require proof positive that terroristic activities are afoot—much less accomplished— before a defendant's conduct can be subject to § 1001(a)'s enhancement. The question is whether there was sufficient evidence to allow the jury to find that De Bruhl's conduct involved international terrorism. There was.

Examining the record with "all reasonable inferences made in support of the verdict," *Lanier*, 879 F.3d at 146, the evidence shows that De Bruhl knew of Diya's connection with Arafat, as well as the pair's suspected activities that supported Iran and ISIS, well before she became entangled in her relationship with Diya. *Cf. Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (stating that giving money to a foreign terrorist organization necessarily involves international terrorism). De Bruhl was told repeatedly by her colleagues in the intel community to stay away; instead, she became more enmeshed, seeking favors, accepting gifts, and eventually having an intimate affair with him. Then, she tipped Diya off that he and Arafat were targets of a counterterrorism investigation, actively lied about this to federal agents, and counseled Diya to conceal her involvement—including by coaching him for his own interview with federal agents. At bottom, the record before us is sufficient for a reasonable jury to conclude that De Bruhl's false statements to federal investigators involved international terrorism, such that § 1001(a)'s enhancement applies.

That said, despite the Government's invitation, we decline to endorse an overbroad reading of § 1001(a), which might sweep in even incidental

No. 22-20650

proximity or unknowing involvement with a counterterrorism target. Put differently, the Government must prove more than the mere existence of a counterterrorism investigation to impose the terrorism enhancement. There must be sufficient evidence to support a jury finding that the defendant's conduct involves terrorism, as delineated by §§ 1001(a) and 2331. Here, as detailed *supra*, there is such evidence. De Bruhl's own actions in covering her tracks—and asking Diya to do the same—and her career-long immersion in the intel community betray that she grasped, better than most, the credible information tying Diya to suspected support for terrorism as well as the assessments along those lines of her agency colleagues. The evidence adduced at trial was sufficient for the jury to conclude that her conduct involved international terrorism, and the statutory enhancement was therefore proper.

## B.

De Bruhl next contends that § 1001(a)'s terrorism enhancement is unconstitutionally vague as applied to her because it provides no notice of the conduct it criminalizes and invites arbitrary enforcement. Both arguments are unpersuasive.

This court reviews "a preserved challenge to the constitutionality of a criminal statute" de novo. *United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016) (citing *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014)). We likewise review a district court's denial of a motion to dismiss de novo. *United States v. Thomas*, 724 F.3d 632, 640 (5th Cir. 2013). When addressing whether an indictment fails to state an offense, "the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999)).

No. 22-20650

"Courts must indulge a presumption of constitutionality and carefully examine a statute before finding it unconstitutional." *United States v. Anderton*, 901 F.3d 278, 283 (5th Cir. 2018) (citing *Skilling v. United States*, 561 U.S. 358, 405–06 (2010)). A criminal statute is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). As to "fair notice," the Constitution requires a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo*, 332 U.S. 1, 8 (1947). To gauge "arbitrary enforcement," courts consider whether the statute is liable to being "stretched out of shape." *Skilling*, 561 U.S. at 412. "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975) (citing *United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963)).

With these guiding principles, the first question is whether an ordinary person would be aware that § 1001(a)'s terrorism enhancement penalizes interfering with a counterterrorism investigation of a target's suspected activities in aid of known sponsors of terrorism like Iran and ISIS. The answer is readily apparent: Yes. As the parties substantially agree, "involves" means "to relate closely: [c]onnect." *Involve*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/involve (accessed October 2, 2024); *see also Vickers*, 540 F.3d at 365. The statutory scheme also defines "international terrorism" in some detail. § 2331(1). Applied "to the facts of the case at hand," *Mazurie*, 419 U.S. at 550, De Bruhl knew, *inter alia*, that the investigation into Diya was about his ties to Arafat, Iran, and ISIS, a designated terrorist organization, 69 Fed. Reg. 75587 (Dec. 17, 2004). Indeed, she knew more about his suspected activities than "an ordinary person" would have, given her access to sensitive intelligence data

14

No. 22-20650

and to colleagues in the intel community—who uniformly told her to avoid Diya. Regardless, an ordinary person would have known that compromising an investigation and then concealing that she had done so would undermine the FBI's efforts to discover and thwart Diya's and Arafat's suspected support of terrorism. Thus, the facts in this case fall within the mine run of conduct implicating § 1001(a)'s enhancement, and the statute provides a "sufficiently definite warning" that De Bruhl's conduct was "proscribed . . . when measured by common understanding and practices." *Petrillo*, 332 U.S. at 8.

And § 1001(a)'s enhancement is not subject to being "stretched out of shape" by prosecutors seeking arbitrarily to define "terrorism" for themselves. *Skilling*, 561 U.S. at 412. Instead, that statute references the detailed definition of "terrorism" in § 2331. Though it may be debatable whether a specific act fits within § 2331(1)'s definition, and whether an offense under § 1001(a) thereby "involves international . . . terrorism," so long as there is sufficient evidence that the offense "involves" terrorism, the jury is entitled to resolve that debate. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[W]e can never expect mathematical certainty from our language."). That § 1001(a) allows for prosecutorial discretion in seeking its enhancement is not unique, and the statute is far from standardless. It is thus not unconstitutionally vague as applied to De Bruhl.

## C.

Finally, De Bruhl argues that 18 U.S.C. § 1512(c)(2) does not criminalize the conduct for which she was charged in Count 15 (telling Diya he was under investigation), Count 36 (telling Diya he faced arrest in the United States), and Count 37 (telling Diya that Arafat was under investigation). Specifically, De Bruhl contends that tipping off a target of an investigation does not interfere with the types of evidence specified by

No. 22-20650

§ 1512(c)(1), i.e., records, documents, or other objects, so her conduct likewise does not implicate § 1512(c)(2). The Government disagrees, contending that compromising the investigation into Diya and Arafat constituted interference with possible witness testimony and intangible information. Section 1512(c)(2)'s scope was squarely before the Supreme Court in *Fischer v. United States*, 144 S. Ct. 2176 (2024). And *Fischer* requires reversal of De Bruhl's convictions as to these three counts.

> Section 1512(c) provides that:
>
> Whoever corruptly—
>
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>>
>> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

De Bruhl was charged under § 1512(c)(2), but the meaning of that residual clause depends on the broader statutory context. *Fischer*, 144 S. Ct. at 2183; *see Koutsostamatis*, 956 F.3d at 306 ("Text should never be divorced from context."). In *Fischer*, the Supreme Court focused on what conduct was prohibited by the "otherwise" clause in § 1512(c)(2) and emphasized that its broad language is cabined by the narrower terms that precede it in § 1512(c)(1). 144 S. Ct. at 2185. Indeed, construing the two subsections independently would lead to applying the statute "exactly backwards." *Id.*

Fischer was charged under § 1512(c)(2) with interfering with Congress's joint session on January 6, 2021, to certify the votes in the 2020 Presidential election. *Id.* at 2182. He "trespassed into the Capitol and was involved in a physical confrontation with law enforcement." *Id.* The

No. 22-20650

question was whether § 1512(c)(2) encompassed obstruction of an official proceeding by trespassing and interfering with law enforcement. The Court held it did not.

Instead, reading § 1512(c)(1)–(2) in tandem, the conduct proscribed by the statute must comprise "obstruct[ing], influenc[ing], or imped[ing] any official proceeding" by tampering with *evidence*. *See id.* at 2186 ("Subsection (c)(2) was designed by Congress to capture other forms of evidence and other means of impairing its integrity or availability beyond those Congress specified in (c)(1)."). Because the defendant's charged conduct in *Fischer* did not implicate evidence, his conviction under the statute could not stand. *Fischer*, 144 S. Ct. at 2190.

The Court rejected the Government's effort to "transform[] this evidence-focused statute into a one-size-fits-all solution to obstruction of justice." *Id.* at 2189. The Court emphasized that construing § 1512(c)(2) so broadly as to cover Fischer's conduct would "would consume (c)(1), leaving that narrower provision with no work to do." *Id.* at 2185. And such a reading would render many other obstruction statutes equally irrelevant. *Id.* at 2187 ("[N]umerous provisions that target specific criminal acts and settings . . . . would be unnecessary if (c)(2) criminalized essentially all obstructive conduct.") (internal citation omitted).[5]

Of course, the Court hastened to explain that § 1512(c)(2) is not limited to obstructive acts related to physical evidence like documents or records. The statute also applies to "other things . . . such as witness testimony or intangible evidence." *Id.* at 2186. *Fischer*'s favorable discussion

---

[5] The Court also discussed how such an application would be counter to the history of § 1512(c)(2). Namely, subsection (c)(2) was enacted to close a loophole in the Sarbanes-Oxley Act, which initially failed to "'impos[e] liability on a person who destroys records himself[.]'" 144 S. Ct. at 2186 (quoting *Yates v. United States*, 574 U.S. 528, 535–36 (2015) (plurality opinion)).

No. 22-20650

of *United States v. Mintmire*, 507 F.3d 1273 (11th Cir. 2007), offers insight about what that entails. 144 S. Ct. at 2186. In *Mintmire*, the defendant attempted to orchestrate a witness's grand jury testimony by creating false documentation and sending notes to an attorney so he could coach the witness for an upcoming grand jury proceeding. 507 F.3d at 1290. Our sister circuit held that the defendant's actions fell within § 1512(c)(2)'s purview, *id.*, and the Supreme Court agreed, citing *Mintmire* as an example of the type of intangible evidence covered by § 1512(c)(2). *See Fischer*, 144 S. Ct. at 2185–86; *see also* 18 U.S.C. § 1512(f)(2) (stating that "[f]or the purposes of this section . . . the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege").

The Government asserts that De Bruhl's conduct impaired "witness testimony and intangible information." But the Government provides scant support for the notion that De Bruhl's alert to Diya that he and Arafat were under investigation, or her warning that Diya would be arrested if he traveled to the United States, "obstruct[ed], influence[d], or impede[d] any official proceeding" by impairing *evidence* to be used in the proceeding. It supposes that when a target is tipped off that he is under investigation, "the individual could destroy evidence." But conjecture that a tipped-off target *could* destroy evidence is not sufficient to *show* evidence impairment. *See United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone cannot stand.")). Even in its post-*Fischer* supplemental briefing, the Government does not connect De Bruhl's conduct to any evidence that was purportedly impaired. Instead, it merely asserts that the indictment "is sufficient to allege an offense under subsection (c)(2) because [it] alleged conduct that impaired the integrity of 'other things'—here, witness testimony and intangible information." Without

No. 22-20650

alleging—much less proving—how, the Government's conclusory theory that De Bruhl's tipping off Diya impaired evidence is not enough.

The only specific source of possible impaired evidence the Government identifies is Diya's electronic devices. It posits that "[b]ecause he was arrested in Canada, the FBI was unable [to] search the electronic media he had with him, which would have been helpful to their investigation." But this is no less speculative than the Government's other assertions, particularly considering that Diya's visa application was denied, such that he would not have been allowed entry into the United States regardless of De Bruhl's telling him so.

A comparison of Counts 15, 36, and 37 with Count 28 of De Bruhl's indictment brings the deficiency of those three counts into sharper relief. Count 28 charged De Bruhl with preparing Diya for an interview with federal investigators and coaching him on what to say, and what not to say. Count 28 thus aligned much more with *Fischer*'s reading of § 1512(c)(2), and it alleged conduct—tampering with witness testimony—more analogous to what the defendant had done in *Mintmire*. *See* 507 F.3d at 1290. But because Count 28 was dismissed on Speedy Trial Act grounds before trial, the conduct alleged there cannot now bootstrap Counts 15, 36, and 37, which otherwise fall out-of-bounds of the Supreme Court's admonition not to apply § 1512(c)(2) as a general anti-obstruction statute. *See Fischer*, 144 S. Ct. at 2189. Following *Fischer*, we conclude that De Bruhl's convictions under these three counts must be vacated.

## D.

Because we vacate De Bruhl's convictions under Counts 15, 36, and 37, we must address De Bruhl's sentence. *See United States v. Clark*, 816 F.3d 350, 360 (5th Cir. 2016) ("The reversal of some, but not all, counts of conviction requires a determination regarding the sentencing of the

No. 22-20650

remaining convictions."). De Bruhl asserts that her sentence should be vacated to allow the district court to revisit it in the light of her vacated convictions. Tellingly, the Government provides no rebuttal as to this issue. We agree with De Bruhl.

In some circumstances, "the aggregate sentence must be unbundled, and the defendant must be resentenced on all counts." *Clark*, 816 F.3d at 360. This must occur "when the sentences or counts are interrelated or interdependent—for example, when the reversal of the sentence on one count necessarily requires the review of the entire sentence." *Id.* This can happen when the reversed counts had influenced the district court's application of the Sentencing Guidelines as to the remaining counts, such as when the reversed counts were the basis for an enhancement. *See id.* Even without such a direct impact, resentencing is warranted if other counts were "bundled to the reversed counts," were part of a "sentencing package," and all ran concurrently. *United States v. Solorzano*, 65 F.4th 245 (5th Cir.), *cert. denied*, 144 S. Ct. 306 (2023) (remaining count required resentencing "even though it was untouched" on appeal because it was bundled to the reversed counts); *see also United States v. Teel*, 691 F.3d 578 (5th Cir. 2012) (citing *United States v. Bass*, 104 F. App'x 997, 1000 (5th Cir. 2004) (per curiam)) ("When a defendant is convicted of more than one count of a multicount indictment, the district court is likely to fashion a sentencing package in which sentences on individual counts are interdependent."); *cf. Clark*, 816 F.3d at 360 (resentencing unnecessary because the reversed count carried a mandatory life sentence to be served consecutively to the remaining counts, which carried their own mandatory life sentences).

Here, the district court explicitly bundled De Bruhl's twelve counts of conviction under U.S.S.G § 3D1.2(b), (d), and ordered her sentence on each count to run concurrently, including those imposed for Counts 15, 36, and 37. The counts are thus sufficiently "interrelated or interdependent" to

No. 22-20650

warrant resentencing in toto. So we vacate the aggregate sentence and remand for the district court to re-weigh De Bruhl's sentence based on her remaining counts of conviction.

## III.

To recap: Whether to apply 18 U.S.C. § 1001(a)'s terrorism enhancement to De Bruhl's conduct, as charged in Count 24, was a question properly for the jury, as there was sufficient evidence to convict on that count. Further, § 1001(a)'s enhancement is not unconstitutionally vague. We therefore AFFIRM De Bruhl's conviction as to Count 24.

But the conduct charged in Counts 15, 36, and 37 does not involve interfering or impairing evidence, as required by 18 U.S.C. § 1512(c)(2). *See Fischer*, 144 S. Ct. at 2185–89. We accordingly VACATE De Bruhl's convictions as to Counts 15, 36, and 37. In turn, we also VACATE her sentence and REMAND for resentencing.